**People of the State of Illinois, Appellee, v. James Lee Harris, Appellant.**

**Gen. No. 51,293.**

First District, Third Division.

February 29, 1968.

<br>
<br>
<br>

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall J. Hartman and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and James B. Zagel, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

James Harris was found guilty of armed robbery in a nonjury trial and was sentenced to the penitentiary for a period of not less than 15 years and not more than 35 years.

About 1:30 p. m. on a Saturday afternoon in October 1964, Charles Irwin wanted to cash a check. The banks were closed so he took a bus to a tavern where he knew the proprietor. He bought a six-can carton of beer and cashed the check. The money he received was in excess of $130 and was in tens, fives and singles. He put the roll of bills in his pocket next to his wallet and returned home. As he went up the front steps of his home he felt something shoved in his back. He turned and saw a man in a black leather jacket pointing a gun at him. Irwin, who was 78 years old, resisted and suffered a bump on his head and three cuts on his arm. The robber's hat came off during the struggle. He tore open

the pocket where Irwin had placed his money, seized the money and Irwin's wallet and ran. Irwin chased him down an alley but was outdistanced.

In the meantime a neighbor had called the police. Irwin hurried home but a police officer was there ahead of him. He got in the police car and they drove down the alley. As they emerged from the alley Irwin saw the defendant Harris about 100 feet away and pointed him out as the robber. The officer turned his car in Harris' direction and, as he did so, Harris ran into another alley. The officer chased him by car and on foot. Irwin stayed in the car.

The chase led up and down side streets, through alleys and parking lots. Another squad car came along and joined in the chase. Finally Harris ran into a dead-end alley and was caught. After a struggle he was handcuffed and searched. A gun was found in one pocket and in another $140 in cash and a wallet which contained $4 and Irwin's identification papers. Harris said he did not know how he happened to have the wallet in his pocket. He was taken to a police station.

The officer returned to his car and told Irwin: "We got him. We got the money and we got the pocketbook." He showed Irwin his wallet and the money and drove him to the police station. At the station Irwin confronted the handcuffed man and identified him as the robber. Harris denied the robbery. He also denied that he owned the hat which had been recovered from Irwin's steps. It was placed on his head and it fit him.

At his trial Harris testified that he ran from the police because one of them fired a shot at him and he was afraid of being killed. He denied robbing Irwin or striking him with a gun. He admitted that the gun was his but denied having Irwin's wallet in his possession. He said the money belonged to him and his sister; that his sister, with whom he lived, had given him $67.50, her half of their $135 monthly rent and that the balance was

his own. He testified that he did not own a hat and that the one tried on at the station did not fit him.

The defendant's first contentions are that he was denied due process of law because of the manner in which he was identified and that he was prejudiced because the hat was not produced at his trial.

At times in his testimony Irwin referred to the robber as wearing a black leather jacket and at one time said he knew Harris was the robber because of the jacket. These references, plus the police officer's post-arrest remark: "We got the man," and the confrontation at the police station with the lone, handcuffed defendant, form the basis for the denial of due process contention. Harris argues that Irwin did not know the facial features of the robber; that the officer's remark convinced Irwin that the man who robbed him was captured; that he went to the police station prepared to identify any man shown to him by the police, and Harris happened to be that man.

Irwin's identification was not limited to the jacket. He was robbed in the middle of the day. He turned, faced the robber and scuffled with him. He saw Harris' face and he testified that he knew it when he pointed Harris out to the officer from the police car. The accuracy of this identification was confirmed by the developments which followed.

Irwin initiated the identification—not the police. They pursued Harris because of what Irwin told them—not because of their independent information or suspicion. Irwin did not go to the station to view a suspect arrested by the police. He went there to process the case against the man he had identified beforehand and perhaps to obtain his money and the papers from his wallet. The question asked him upon his arrival, "Is that him? " was superfluous and his answer merely confirmed what he had previously told the police.

■ Furthermore, proof of Harris' guilt did not depend upon Irwin's identification. He ran away when the police car turned in his direction. He was apprehended a few minutes after the robbery. The proceeds of the robbery were found on him. The gun used in the robbery was in his possession. His flight, his exclusive and unexplained possession of Irwin's wallet and his possession of the weapon are circumstances so incriminating that they would sustain his conviction without Irwin's positive identification.

■ Under the total circumstances of this case, there was no violation of the defendant's right of due process. The individual confrontation at the police station neither suggested nor induced Irwin's identification and it did not taint his subsequent in-court identification. Stovall v. Denno, 388 US 293, 87 S Ct 1967, 18 L Ed2d 1199 (1967) and People v. Kincy, 72 Ill App2d 419, 219 NE2d 662 (1966) cases relied upon by the defendant do not support his position.

■ Harris claims that he was prejudiced because the State suppressed evidence which was material to his defense. The hat found at the scene of the crime was not in court. Harris implies that if the hat had been produced in court it would not have fit him and this would have proved that someone else committed the crime. He argues that the failure of the State to have the hat in court raises an inference negative to the State's testimony that the hat fit him, and that the suppression of this evidence was also a deprivation of due process. The record does not disclose that at the time of trial the hat was in the possession of either the police or the State. The arresting officer testified that he did not know where the hat was and said that it had not been inventoried. There was no evidence impugning the truth of the officer's assertion that the hat was not retained by the police, and no demand had been made before trial for its production. For all that the record shows, the hat

may have been given to the defendant and may have been more available to him than to the State. What was said by the court in People v. Taylor, 35 Ill2d 341, 220 NE2d 164 (1966), is apropos here: "This is not a case such as Brady v. Maryland, 373 US 83, 10 L Ed2d 215 [relied upon by Harris] . . . where it was clear that the prosecution concealed information in its possession favorable to the defendant." People v. Faulkner, 83 Ill App2d 54, 226 NE2d 467 (1967) also relied upon by Harris is not in point. In Faulkner, narcotics were found in clothing supposedly belonging to the accused. Faulkner, who was indicted for possession of narcotics, denied that the clothing was his. Proof that he owned the clothing was essential to the State's case; without this proof Faulkner's exclusive control of the narcotics could not be established. The clothing had not been tried on the defendant and it was not produced in court. The Appellate Court held that the State's proof was deficient. In the present case ownership of the hat was not an essential element in the proof of the defendant's guilt.

The last two contentions are that the trial judge questioned him at length and in doing so became a prosecutor rather than an impartial trier of the facts, and that the sentence imposed upon him was too severe.

█ The trial judge questioned the defendant after his attorney and the assistant State's attorney had finished their examinations. In response to the court's questions, Harris said that the gun was not found on him but in the alley where it had fallen out of his pocket; that the only wallet taken from him was his own and this was returned to him by the police. The judge asked him about his sister. He replied that he had expected her to be in court to tell about the rent money she had given him the day he was arrested. The judge offered to continue the case to the following morning so that his sister could be brought in. The defendant requested that this be done and the trial was postponed. The sister

417

was in court the next day and substantially corroborated Harris' testimony concerning the money. However, she said she gave him $135 not $67.50, and on cross-examination she said she could not remember the date she gave him the $135.

It is now urged that the trial judge's insistence forced the defendant to bring in a witness whose testimony contradicted his, that this unwarranted meddling by the judge interfered with his trial strategy and that the searching and biased cross-examination by the judge prejudiced him. All of these accusations are unfounded. The judge's questions were fair and his examination impartial. His questions made it possible for Harris to amplify and clarify his previous testimony. His offer to postpone the trial so that Harris' sister could testify was more than fair. Gratitude for extending this consideration to the defendant may not be expected but criticism for it is both undeserved and unkind. The case was not tried before a jury and there was nothing in the conduct of the trial prejudicial to the defendant.

In sentencing the defendant to a term of 15 to 35 years in the penitentiary the court observed that he would be eligible for parole at the end of 10 years, and that his robbing a 78-year-old man while armed with a gun and his prior record made a lesser sentence inappropriate. Harris had served two short sentences for petty larceny and a 3- to 10-year sentence for armed robbery. There is no sound reason for reducing the period of imprisonment imposed by the trial court.

The judgment is affirmed.

Affirmed.

SCHWARTZ and SULLIVAN, JJ., concur.